**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| | : | |
| RGN-GROUP HOLDINGS, LLC, *et al.*, | : | Case No. 20-11961-BLS |
| | : | |
| Reorganized Debtors. | : | (Jointly Administered) |
| | : | |

| | | |
|---|---|---|
| RGN-GROUP HOLDINGS, LLC, *et al*, | : | |
| | : | Civ. No. 21-1430-RGA |
| Appellants and Cross-Appellees, | : | Civ. No. 21-1476-RGA |
| v. | : | |
| | : | |
| TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA, | : | |
| | : | |
| Appellee and Cross-Appellant. | : | |

## **OPINION**

Eric W. Pinker (argued), Greg Brassfield, Bennett Hampilos, Lynn Pinker Hurst & Schwegmann, LLP, Dallas, TX; Ricardo Palacio, Ashby & Geddes, P.A., Wilmington, DE, attorneys for appellants and cross-appellees the Reorganized Debtors.

Charles S. Kelley (argued), Michael P. Lennon, Jr., Susan L. Alkadri, Mayer Brown, Houston, TX; David W. Carickhoff, Bryan J. Hall, Archer & Greiner, P.C., Wilmington, DE, attorneys for appellee and cross-appellant Teachers Insurance and Annuity Association of America.

September 28, 2022

*Richard G. Andrews*

**ANDREWS, UNITED STATES DISTRICT JUDGE:**

This matter arises from the chapter 11 cases of RGN-Group Holdings, LLC and certain affiliates ("Debtors"). At issue in this appeal is a commercial lease agreement (A1391-A1454)[1] (as amended, the "Lease") between Teachers Insurance and Annuity Association of America ("TIAA" or "Landlord"), as landlord, and Reorganized Debtor H Work, LLC ("H-Work"), as tenant. In 2014, H-Work assigned the lease to RGN-Dallas IX, LLC ("RGN" or "Tenant"), a special purpose entity and affiliate of H-Work. Following the assignment, RGN entered into two lease amendments with TIAA. Thereafter, RGN breached the Lease. TIAA terminated the Lease and filed a proof of claim for damages against the Debtors in the amount of $5,770,809.97, which was capped at $5,589,547.48 pursuant to 11 U.S.C. § 502(b)(6).[2] The Debtors objected to TIAA's proof of claim on the basis that Debtor H-Work was not a party to either of the two lease amendments, having unilaterally assigned the Lease to non-debtor affiliate RGN.

Following trial, the Bankruptcy Court issued an order (Bankr. D.I. 1868; A0999-A1011) (the "Order") and accompanying decision, *In re RGN-Group Holdings, LLC*, 2021 WL 4203336 (Bankr. D. Del. Sept. 15, 2021) (the "Opinion") which sustained, in part, and overruled, in part, the Debtors' objection to TIAA's claim, and allowed TIAA's claim in the reduced amount of $3,380,155.37. Before the Court is the Debtors' Appeal from the Order (Civ. No. 21-1430-RGA, D.I. 1) along with TIAA's Cross-Appeal (Civ. No. 21-1746-RGA, D.I. 1). For the reasons set

---

[1] The appendix to Debtors' opening brief in support of the Appeal (Civ. No. 21-1430-RGA, D.I. 25-27) is cited herein as "A___," and the appendix to TIAA's answering brief (*id.*, D.I. 30), is cited herein as "TA___." To avoid confusion, the appendix to TIAA's opening brief in support of its Cross-Appeal (Civ. No. 21-1476-RGA, D.I. 18-20) is cited herein as "TIAA___"

[2] Section 502(b)(6) of the Bankruptcy Code imposes certain limitations on the allowed amount of a landlord's claim for breach of a nonresidential real property lease in bankruptcy. *See* 11 U.S.C. § 502(b)(6). The section 502(b)(6) cap is not relevant here because the amounts sought by TIAA in its claim (including the amounts sought in TIAA's Cross-Appeal) are within the cap, and Debtors do not contend otherwise.

forth herein, the Order is affirmed.

## I.   BACKGROUND

### A.   The Lease

The Lease at issue is dated October 12, 1987, and was amended nine times.  Metropolitan

Life Insurance Company ("MetLife") is the predecessor in interest to TIAA.  "ESP – Executive

Services Plus of Texas, Inc." ("ESP") is the predecessor in interest to H-Work.  MetLife and ESP

entered into the original Lease for a building known as Three Lincoln Centre, which is one of

three office towers in the five-building Lincoln Centre complex.  (*See* A1555 § A).

The parties contemplated "Lease Term" extensions from the outset.  Section 3(a) of the

Lease ("Lease Term") provides:

> This Lease shall continue in force during a period beginning on the Commencement Date
> and continuing until the expiration of the Lease Term, unless this Lease is sooner
> terminated or extended to a later date under any other term or provision hereof.

(A1398 § 3(a)).  The Commencement Date was the earlier of the date the Tenant actually occupied

the Premises or December 1, 1987.  (A1395 § 1(d)).

The Lease sets forth the Landlord's contractual remedies in the event Landlord terminates

the Lease for an Event of Default.  Section 25(d) provides:

> In the event that Landlord elects to terminate this Lease, then, notwithstanding such
> termination, Tenant shall be liable for and shall pay to Landlord the sum of all Rents and
> other indebtedness accrued to the date of such termination, plus, as damages, an amount
> equal to the total of (i) the cost of recovering the Premises, (ii) the cost of removing and
> storing Tenant's and other occupant's property located therein, (iii) the costs of reletting the
> Premises (including, without limitation, brokerage commissions), (iv) the cost of
> decorations, repairs, changes, alterations, and additions to the Premises whether
> accomplished in one or more steps or phases, (v) the cost of collecting such amounts from
> Tenant hereunder, and (vi) any other sums of money or damages that may be owed to
> Landlord as the result of default by Tenant or the exercise of Landlord's rights at law or in
> equity.

(A1418 § 25(d)).

The original parties amended the Lease four times.  (*See* A1555 § A).  HQ Global

3

Workspaces LLC ("HQ"), which became H-Work, succeeded to the interest of ESP under the Lease, and HQ and MetLife executed a Fifth Amendment to the Lease. (*See id.* §§ B, C; *see also* A0678-A0682 ("Stipulated Facts") at A0679 ¶ 9). Pursuant to the Fifth Amendment, HQ relocated to approximately 17,485 square feet of Rentable Area (the "Current Premises") located on the 12th Floor of the Three Lincoln Centre Building. (*See* A1555 § C).

Thereafter, TIAA purchased Lincoln Centre and succeeded to the interest of MetLife. (*See id.* § D). TIAA and HQ executed a Sixth Amendment to the Lease in 2007 (*see* A1523-A1527), followed by a Seventh Amendment (*see* A1538-A1550) on October 26, 2012. The Seventh Amendment provided for a Lease Term that was set to expire on July 31, 2019. (A1539 ¶ 2).

### B.    The Assignment

Effective as of June 30, 2014, while the Seventh Amendment was in effect, H-Work unilaterally assigned the Lease to special purpose entity RGN, and RGN assumed the corresponding obligations and liabilities under the Lease. (A1591-A1594; A0680 ¶ 12). The notice of assignment was presented to TIAA by H-Work as having already occurred. (*See* A1590-A1591). It is undisputed that H-Work did not seek or obtain a release from its contractual privity in connection with the assignment. It is further undisputed that, at the time of the assignment, and at all relevant times thereafter, H-Work and RGN were affiliates under common control. (*See* TA075-TA076; A0928-A0981 ("8/13/21 Tr.") at A0944:8-20)). Michael J. Osburn, H-Work's witness at trial, had executed the assignment in 2014 on behalf of both H-Work, as assignor, and its affiliate, RGN, as assignee, in his capacity as the "Authorized Person," an official role he maintains to date for both these entities, as well many other entities under parent company Regus. (*See* A1591-A1592; *see also* 8/13/21 Tr. at A0941:1-A0942:7). The assignment effectuated a Regus policy that each commercial lease be held by a single special purpose entity or special purpose vehicle. (8/13/21 Tr. at A0940:7-20; A0944:25-A0945:5).

4

## C.     The Eighth Amendment

On July 26, 2019, TIAA and RGN executed an Eighth Amendment to the Lease, which extended the term of the Lease until July 31, 2020. (A1551-A1552). Again, Mr. Osburn in his capacity as Authorized Person executed this Eighth Amendment for Tenant. (A1554). The Eighth Amendment to the Lease was a bridge pending conclusion of negotiations for and completion of a move to a larger, upgraded space in One Lincoln Centre, within the same office complex ("Relocation Premises"). (8/13/21 Tr. at A0948:25-A0949:1). All parties acknowledged they understood that RGN would remain in its Current Premises in Three Lincoln Centre until its relocation to One Lincoln Centre took place, whenever that occurred. (A0683-A0927 ("8/12/21 Tr.") at A0753:15-23; 8/13/21 Tr. at A0946:17-22; A0957:4-11).

## D.     The Ninth Amendment

On December 19, 2019, five months after executing the Eighth Amendment and more than six months before the extended Lease term was set to expire, TIAA and RGN amended the Lease for a ninth time (*see* A1555-A1590) ("Ninth Amendment"). As expected, this Ninth Amendment to the Lease provided for an extension of the Lease Term, and, after a build out period, a move to a larger, upgraded space in One Lincoln Centre. (*Id.*) The Ninth Amendment was also executed by Mr. Osburn. The Ninth Amendment extended the Lease Term per section 2: "The Lease Term is extended to expire on the last day of the one hundred fifty-sixth (156th) full calendar month following the Relocation Date." (A1556 § 2 (Lease Term)). Upon occurrence of the Relocation Date, as defined, RGN would relocate within the complex from the Current Premises in Three Lincoln Centre to the larger, updated Relocation Premises in One Lincoln Centre and pay higher rent over the remaining 156-month term of the Lease. (A1555 § H; A1556-A1558 §§ 3-4; Stipulated Facts at A0680). Prior to the Relocation Date, RGN would continue to occupy and pay the existing monthly rent for the current space in Three Lincoln Centre. (A1556-A1558).

Upon execution of that Ninth Amendment, TIAA paid all brokerage commissions totaling $2,006,910.17. (A0875:11-A0876:11). TIAA moved two tenants out of the Relocation Premises—Allstate and Entos Design, Inc. ("Entos")—to other space in the Lincoln Centre campus, which required building out new comparable spaces for those tenants at a combined cost of $1,688,009.79, and a third tenant that had to move from the Relocation Premises chose to terminate its lease. (A0760:6-15; A0871:16-22; A0872:3-9). Finally, TIAA renovated the One Lincoln Centre lobby with Class A finishes, including demolishing and rebuilding public restrooms in a different lobby location, at a cost of $2,056,169.57. (A1624-A1625). Not later than October 7, 2020, Landlord delivered the Relocation Premises to Tenant. (TA052-TA054).

### E.    The Breach and Termination

On April 21, 2020, TIAA's property manager, Cushman & Wakefield ("CW"), sent an email notifying RGN that the second and third floors of the Relocation Premises were vacant and ready for RGN to commence its build-out of the space. RGN took no actions to complete its build-out of the space and move in. RGN was notified in August 2020 that the first floor was available, and that RGN could take possession of that space. Again, RGN made no attempt to move into the space. It is undisputed that RGN was under no obligation to move into any portion of the Relocation Premises until the Relocation Date—the full space was made available to RGN on or about October 7, 2020, making the Relocation Date February 19, 2021 under the terms of the Ninth Amendment. (A1556-A1557 § 3(c)). It is also undisputed that the Relocation Date, as defined in the Ninth Amendment to the Lease, never occurred.

In both August and September 2020, RGN failed to timely pay the base rent then due under the Lease. (Stipulated Facts A0681 ¶ 19). Though not required, on September 10, 2020, TIAA inquired with RGN as to the unpaid August and September rent and other operating expenses, and RGN subsequently paid its August and September 2020 rent. (*Id.*) It is undisputed

that in October 2020, RGN breached the Lease again by failing to timely pay its base rent on the 10th day of the month and before expiration of the five (5) calendar day grace period allowed by the Lease. (*Id.* ¶ 20). RGN's failure to pay its base rent was an Event of Default under the Lease. (A1417 § 25(a)). As a result of this breach, TIAA exercised its right to terminate the Lease on October 16, 2020 (the "Termination Date"). (*Id.*).

On November 2, 2020, TIAA filed a Petition for Eviction in the case captioned *Teachers Insurance and Annuity Association of America v. RGN-Dallas IX, LLC*, Case No. JE-20-01431-A. The Justice of the Peace Court issued an eviction order on November 16, 2020. (A1612). Debtors assert that, on May 6, 2021, RGN filed suit against TIAA asserting claims for declaratory relief, breach of contract, wrongful termination of the Lease, and wrongful eviction pursuant to Section 93.002 of the Texas Property Code, seeking recovery from RGN and its guarantor. (D.I. 24 at 16).

### F.   The Proof of Claim and Order

TIAA filed a proof of claim in the chapter 11 cases, which was later amended (A0669-A0677), and Debtors objected (A0232-A0485), seeking disallowance of TIAA's claim in its entirety. Debtors contended that any privity of contract between H-Work and TIAA terminated upon execution of the Eighth Amendment to the Lease and therefore H-Work cannot be liable as a matter of law for damages arising from any breach of the Lease after the expiration of the Seventh Amendment. Debtors asserted that H-Work never agreed to be responsible for any of the obligations under the Eighth or Ninth Amendments, which were negotiated and entered into between TIAA and RGN. Alternatively, Debtors asserted that RGN never breached the Ninth Amendment because TIAA terminated the Lease months before the Relocation Date that would have triggered RGN's performance obligations thereunder. TIAA countered that, under black letter law in Texas, a tenant remains obligated to the landlord under a commercial lease, notwithstanding assignment, in the absence of the landlord granting a release to the tenant. Here,

the assignment of the Lease from H-Work to RGN occurred without TIAA's consent, and TIAA never released H-Work from any of its obligations under the Lease. TIAA argued therefore that privity of contract between it and H-Work was unaffected by the assignment and persisted through the Eighth and Ninth Amendments to the Lease.

The Bankruptcy Court determined that H-Work remained in contractual privity notwithstanding the assignment, and that the Lease was breached by RGN. *In re RGN-Group Holdings*, 2021 WL 4203336 at *5-6. The Bankruptcy Court allowed the majority of the damages sought in TIAA's claim, including unpaid rent in the amount of $19,720.44 (*id.* at *7), partial brokerage commissions in the amount of $1,672,425.14 (*id.*), and tenant relocation expenses in the amount of $1,688,009.79 (*id.* at *8).

The Appeal is fully briefed (Civ. No. 21-1430-RGA, D.I. 24, 29, 32), and the Cross-Appeal is fully briefed as well. (Civ. No. 21-1476, D.I. 17, 21, 23).

## II.    JURISDICTION

Appeals from the Bankruptcy Court to this Court are governed by 28 U.S.C. § 158. District courts have jurisdiction to hear appeals "from final judgments, orders, and decrees." 28 U.S.C. § 158(a)(1). Disallowance of a proof of claim (or portion thereof) is a final order as it resolves the dispute between the claimant and the debtor. *In re Future Energy Holdings*, 2016 WL 4925052, at *2 (D. Del. Sept. 14, 2016); *In re Residential Capital LLC*, 563 B.R. 477, 485 (S.D.N.Y. 2016).

## III.    STANDARD OF REVIEW

In conducting its review of the issues on appeal, this Court reviews the Bankruptcy Court's findings of fact for clear error and exercises plenary review over questions of law. *See American Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir. 1999). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on

8

the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948). The Court must "break down mixed questions of law and fact, applying the appropriate standard to each component." *Meridian Bank v. Alten*, 958 F.2d 1226, 1229 (3d Cir. 1992).

## IV.   ANALYSIS

### A.   H-Work Remains Jointly and Severally Liable for Obligations Under the Lease Pursuant to Well-Settled Texas Law

#### 1.   H-Work Remained in Contractual Privity Following the Assignment

Section 16(c) of the Lease provides: "No assignment or subletting, whether or not with Landlord's consent, shall ever relieve Tenant of any liability hereunder." (A1409 § 16(c)). Under Texas law, "a party cannot escape its obligations under a contract merely by assigning the contract to a third party. Thus, as a general rule, a party who assigns its contractual rights and duties to a third party remains liable unless expressly or impliedly released by the other party to the contract." *Seagull Energy E&P, Inc. v. Eland Energy*, 207 S.W.3d 342, 346-47 (Tex. 2006) (internal citations omitted). Here, the Lease expressly preserves the assignor's liability, and TIAA never released H-Work.

#### 2.   H-Work's Liability Is Not Limited to the Obligations Existing as of the Seventh Amendment

Debtors argue that that the Bankruptcy Court erred in finding that H-Work remained in contractual privity following the assignment and the Eighth Amendment in 2019. Debtors assert, "Texas law dictates that an assignor is not liable for new obligations an assignee unilaterally assumes after the contract's assignment." (Civ. No. 21-1430-RGA, D.I. 32 at 1). According to Debtors, "The assignor's continuing obligations are limited to those the assignor agreed to be bound by—not new obligations later assumed by a different entity." (*Id.*) Debtors purport to cite the "only authorities that delineate the extent of an assignor's liability following assignment under

9

Texas law"—cases which, according to Debtors, "establish that at the time of assignment, there are certain defined rights and obligations," and an assignor's continuing liability is limited "to only those specific obligations it assumed." (*Id.* at 3). According to TIAA, the cases cited by Debtors do not support their argument, and accepting Debtors' argument would mean that an assignor could never remain responsible for a lease if any change is implemented to the lease. I agree with TIAA.[3]

Debtors' argument rests on selectively quoted *dicta* from a handful of Texas cases—*NextEra*, *Potts*, *718 Associates,* and *State Fiduciary Mortgage*—cases that do not in any way address the central issue of this appeal: whether an assignor of rights under a lease remains liable under a subsequently amended lease where the assignee has exercised rights that increase the assignor's liability.

For example, Debtors quote the *NextEra* case,[4] in which the court stated:

> Generally, the assignor of a contract remains liable for the obligations he ***originally*** assumed, even after the contract is assigned. In contrast, the assignee of a contract is not responsible for the assignor's obligations unless he expressly or impliedly assumes them.

*NextEra Retail of Tex., LP v. Inv'rs Warranty of Am., Inc.*, 418 S.W.3d 222, 226-27 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (emphasis supplied by Debtors) (citation omitted). Debtors emphasize the language "originally assumed." This language, however, is *dicta*. The case concerned the liability of an assignee, not an assignor. Which obligations were "originally assumed" was not at issue in the case and had no bearing on the court's ultimate holding. Moreover, no subsequent case cites *NextEra* for the proposition that the assignor's liability is limited to the obligations "originally assumed." Rather, *NextEra* is cited for the proposition that

---

[3] According to counsel at oral argument, not only is there no Texas case dealing with a factual scenario at all analogous to the facts here, there is no case from any other jurisdiction with an analogous factual scenario.

[4] At oral argument, when I asked Debtors for their best case, counsel cited *NextEra*.

an assignee does not take on liability for obligations under a contract unless expressly or impliedly assumed.

Next, Debtors quote the *Jones* case, which involved a claim for a breach of a patent rights agreement. The court noted, "Generally, the assignor of a contract remains liable for performance of the obligations which he assumed therein, even after it is assigned." *Jones v. Cooper Indus., Inc.*, 938 S.W.2d 118, 124 (Tex. App.—Houston [14th Dist.] 1996, writ denied) (citing *Potts v. Burkett*, 278 S.W. 471, 473 (Tex. App.—Eastland 1926, no writ)). The remainder of the paragraph from which the quote is taken states:

> The assignee of a contract is not bound to perform the assignor's obligations under the contract unless they are expressly or impliedly assumed by the assignee. To determine [assignee] Cooper's liability, we must examine whether Cooper expressly or impliedly assumed the royalty obligation under the [agreement].

*Id.* (citations omitted). Like *NextEra*, the issue was what obligations the assignee assumed—not whether the assignor remained liable under an agreement where an assignee exercised rights under the Lease which increased the assignor's liability. *Id.* at 124.

Similarly, Debtors quote *718 Associates*,[5] in which the court stated:

> When the assignor conveys its entire interest, without retaining any reversionary interest, the assignee becomes a tenant in place of the original lessee and is in privity of estate and contract with the lessor. The assignment destroys the privity of estate between the lessor and the original lessee. However, the original lessee's liability on the original contract remains unless expressly released by the lessor. The form of the instrument is not controlling. An instrument may purport to be an "assignment," but will be construed as a sublease if the assignor retains any reversionary interest.

*718 Associates, Ltd. v. Sunwest N.O.P., Inc.*, 1 S.W.3d 355, 361 (Tex. App.—Waco 1999, pet. denied) (citations omitted). This quote, addressing an assignor's liability on the "original

---

[5] At oral argument, when I asked TIAA for its best case, counsel cited *718 Associates*, relying upon a different passage, where the Court stated, "[T]he effect of an assignment can be limited only by exceptions, reservations, conditions, or restrictions contained therein." 1 S.W.3d at 365. This quotation concerns the rights of an assignee and does not help.

11

contract," is not clarified or explained by the court and had nothing to do with the holding of the case. In *718 Associates*, a landlord challenged an assignee's right to exercise a 35-year lease extension. *Id.* The issue before the court in *718 Associates* was whether the assignee (after several assignments) was an assignee, or merely a sublessee. The focus of the court's analysis was whether the subsequent assignment of a lease was a "true assignment" of the lease—conveying the entire "term" of the lease without retaining any reversionary interest—or whether it was merely a sublease. *Id.* at 360-62. Again, the original tenant/assignor's liability was not at issue.

In sum, I agree with TIAA that the language relied upon by Debtors in these cases is, at best, used loosely by those courts and, in any event, is *dicta* that does not lead me to a conclusion different than that reached by the Bankruptcy Court.

Debtors further rely on *State Fiduciary Mortgage*, in which the court stated, "An assignee obtains only the right, title, and interest of his assignor at the time of his assignment, and no more. Accordingly, an assignee may recover only those damages potentially available to his assignor." *State Fid. Mortg. Co. v. Varner*, 740 S.W.2d 477, 480 (Tex. App.—Houston [1st Dist.] 1987, writ denied) (citations omitted). Debtors present an analogy based on the emphasized language: "Just as the assignee cannot receive more rights than the assignor possessed, the assignor's continuing liability is limited similarly to only those specific obligations it assumed." (Civ. No. 21-1430-RGA, D.I. 24 at 20). I disagree that this "basic concept remains true in the context of the Lease." (*Id.* at 17). Here, the pre-existing rights in the Lease existed at the time of assignment, and were thus transferred at assignment. RGN had the right to extend the Lease Term, and an inherent right to amend the Lease. Not only is it standard in the industry, but based on the history of the Lease, it was common for Lease Amendments to extend the Lease Term—as occurred in the First, Second, Fourth, Fifth, Sixth, Seventh, Eighth, and Ninth Amendments. (*See* A1456 § 4; A1472 § 3; A1496 § 4; A1505 § 3; A1524 § 3; A1539 § 2; A1552 § 2; A1556 § 2). Nor was it uncommon

12

to change the amount of leased space—as occurred in the Second, Fifth, and Ninth Amendments. (*See* A1471, A1472 § 4; A1505 § C; A1555, Recital H).  Similarly, the Seventh Amendment granted RGN a right of first notice to additional space.  (A1540 § 9).  Amendments to the Lease also relocated the leased premises—as seen in the Fifth and Ninth Amendments.  (A1505 § C; A1506 § 4; A1555-56, Recital H and § 3).

Debtors further cite the basic principle of contract law that there must be a meeting of the minds to form a contract, arguing that H-Work and TIAA never had a "meeting of the minds" on any contract following expiration of the Seventh Amendment.  (Civ. No. 21-1430-RGA, D.I. 24 at 21).  But Debtors cite no Texas law in support of their proposition that a new meeting of the minds is required in order for an assignor to remain liable under privity of contract.

In sum, Debtors' argument that a lease assignor can only be liable for the particular obligations in existence as of the assignment does not find support in any lease assignment cases upon which they rely, and I find no error in the Bankruptcy Court's conclusion.

### 3.      The Bankruptcy Court Did Not Conflate H-Work's Argument with the Material Change Doctrine

Debtors briefly argue that the Bankruptcy Court erroneously "conflated" H-Work's "assumption of obligations" argument with the "material change doctrine."  (*See* Civ. No. 21-1430-RGA, D.I. 24 at 22-24).   The material change doctrine is a common law doctrine that insulates an assignor from liability when the assignee and its contractual counterpart (i.e., the landlord) materially change the lease's terms.

The Bankruptcy Court explained that, "The Debtors place significant weight on the holding in *NextEra*, which they suggest limit an assignor's liability to those 'obligations he originally assumed'"; that Debtors further posited that, since H-Work did not sign anything beyond the Seventh Amendment, H-Work's obligations under the Lease expired in 2019 when the

five-year term of the Seventh Amendment concluded; and that, "In effect, the Debtors assert that the material change doctrine should operate to permit the Court to infer or impose a release for H-Work where none was formally provided by the landlord." *In re RGN-Group Holdings*, 2021 WL 4203336 at \*5-6.  Debtors argue that the Bankruptcy Court misunderstood their argument and erroneously applied the material change doctrine, which has not been adopted by Texas courts. (Civ. No. 21-1430-RGA, D.I. 24 at 22-23).  "Debtors' argument, which is based in Texas law, is a simpler one: if H-Work never assumed the obligations in the Eighth and Ninth Amendments, H-Work cannot be liable for an assignee's breach of those obligations." (*Id.* at 23).

The Bankruptcy Court's decision as to H-Work's liability rested on its conclusion that H-Work "[r]emain[ed] in Contractual Privity with TIAA" when it assigned the Lease to RGN without a release from TIAA. *In re RGN-Group Holdings*, 2021 WL 4203336 at \*5-6.  As previously discussed, I reject H-Work's challenge to that conclusion.  The parties agree that the material change doctrine is not recognized under Texas law.[6]  (Civ. No. 21-1430-RGA, D.I. 24 at 21-24 & n.10; *id.*, D.I. 29 at 27).  Therefore, neither the Eighth nor the Ninth Amendments to the Lease implicate this doctrine.  I find no error in the Bankruptcy Court's brief discussion of the material change doctrine, in which the Bankruptcy Court expressly stated that the doctrine "does not appear to have been adopted by Texas courts." *Id.* at \*6.

Finally, H-Work argues that the Bankruptcy Court erroneously disregarded corporate formalities because the Opinion notes that H-Work and RGN remained under common corporate

---

[6] Debtors' argument could be rephrased as, "Texas does not need the material change doctrine because it has the immaterial change doctrine.  Any change to the contract (no matter how immaterial) is not the result of a meeting of the minds and therefore breaks contractual privity, thereby relieving the assignor of any further possible liability."  The only reason for the existence of the material change doctrine is to prevent injustice to the assignor.  But there would never be a need for such a doctrine if any minor change was sufficient to let the assignor "off the hook" for the amended contract.

14

control.  (Civ. No. 21-1430-RGA, D.I. 24 at 24).  None of the Bankruptcy Court's determinations
are based on these entities' common corporate control.  The factual history set forth in the Opinion
simply notes that:

> The Lease prohibited assignment generally, subject to certain defined exceptions that
> permitted, among other things, "an assignment of tenant's interest in the Lease to any
> entity controlled by, controlling or under common control with Tenant[.]  Because H-Work
> and RGN[] remained under common corporate control, the Assignment was permitted
> under the Lease.

*In re RGN-Group Holdings*, 2021 WL 4203336 at \*3 (footnotes omitted).  Thus, while the Lease
permitted the assignment at issue, "as [H-Work and RGN] are affiliates under common corporate
control," the Bankruptcy Court explained that TIAA never released H-Work from its
obligations—"not a surprising result," the Bankruptcy Court observed, given that "H-Work
assigned the Lease to a special purpose entity within its corporate family that had neither assets
nor operations."  *Id.* at \*5.  These observations merely followed the Bankruptcy Court's
determination that, under Texas law, H-Work's obligations survived the assignment because
"TIAA never released H-Work from its obligations"—not because H-Work and RGN shared
common corporate control.  *Id.* at \*5 & n.37 (noting, "Under Texas law, an assignor's obligation
will survive assignment unless the contract provides otherwise, or the assignor obtains a release
from the counterparty").  The Opinion also mentions common corporate control in its brief
discussion of the material change doctrine, simply noting that, while there may be circumstances
where application of the material change doctrine would make sense, this is not such a situation:

> H-Work assigned the Lease to RGN[], an assetless special purpose entity created only to
> hold the Lease.  The same individual was and continues to be the authorized person for
> both RGN[] and H-Work.  There is neither surprise nor unfairness to H-Work to hold it to
> the terms of a Lease from which it has not been released.

*Id.* at *6. The Bankruptcy Court's point was that, even if the material change doctrine could be applied here, the rationale for that doctrine—the inequities in permitting un-bargained for obligations—did not exist to justify the doctrine's application here.

I find no support for Debtors' contention that any portion of the Bankruptcy Court's decision erroneously disregarded corporate formalities.

### B.   RGN Breached the Lease

On appeal, Debtors do no dispute that "the Ninth Amendment was enforceable and binding," only that Tenant's financial obligations never commenced. (Civ. No. 21-1430-RGA, D.I. 24 at 25). As TIAA correctly points out, H-Work's argument is inconsistent with the Lease's plain language, as appears in Sections 20 and 21 of the Ninth Amendment. (A1568 § 20 ("Binding Effect"); A1568 § 21 ("Ratification")). Section 2 of the Ninth Amendment immediately extended the Lease Term through the last day of the 156th full calendar month following the Relocation Date. (A1556 § 2). The Lease Term had commenced on December 1, 1987 (A1395 § 1(d)), and ran continuously thereafter. There was never a break or expiration of the Lease Term, as it was continuously extended prior to expiration. Upon occurrence of the Relocation Date, as defined, Tenant would relocate within the complex to the Relocation Premises and pay higher rent over the remaining 156-month term of the Lease. (A1555 § H; A1556-A1558 at §§ 3-4; *see also* Stipulated Facts at A0680 ¶ 14). Until the Relocation Date, Tenant would continue to occupy and pay the existing monthly rent for the current space in Three Lincoln Centre. (A1556-A1558). In fact, the Ninth Amendment added a deadline by which the Relocation Premises had to be tendered by the Landlord, or else H-Work could terminate the Lease. (A1557 § 3(d)).

Section 3(a) of the Ninth Amendment to the Lease is clear that the Lease remained in effect as to the Current Premises until the Relocation Date, at which point the leased property under the Lease converted to the Relocation Premises:

> Effective as of the Relocation Date, Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Relocation Premises on the terms and conditions of the Lease as herein modified.  Accordingly, on the Relocation Date, (i) subject to Section 3(b) hereof, the Lease shall terminate as to the Current Premises, (ii) the Relocation Premises shall be the 'Premises', and (iii) the 5400 Building shall be the "Building".

(A1556 § 3(a)).  There was a tenancy in the Current Premises pursuant to the Ninth Amendment to the Lease.  The Lease Term was continuous, and never lapsed.  Because the Lease remained in full force and effect as to the Current Premises up until the Relocation Date, so too did RGN's obligations to continue making rent payments under the Lease.

The fact that Landlord terminated the Lease before the "Relocation Date" is of no moment, as the damages sought relate to a binding Lease agreement (as modified by that Ninth Amendment).  That the "Relocation Date" never occurred under the Lease means that the Tenant's new rent obligations and certain construction obligations were not triggered.  It does not negate RGN's other obligations under the Lease, like the timely payment of rent and RGN's liability in the event of a default.

Finally, I reject H-Work's argument that there was a holdover tenancy within the meaning of Section 27 of the Lease.  By its terms, Section 27 only applies "In the event of holding over by Tenant after expiration or other termination of this Lease or in the event Tenant continues to occupy the Premises after the termination of Tenant's right of possession pursuant to paragraph 25(b) hereof . . ."  (A1422 § 27).  Here, there was never an instance when no Lease existed.  Section 3(b) of the Ninth Amendment further enforces that RGN was not a holdover tenant.  Pursuant to Section 3(b), RGN becomes a holdover tenant subject to Section 27 of the Lease only if it fails to vacate the Current Premises within 30 days of the Relocation Date:

> Tenant shall, at its expense, vacate and deliver to Landlord the Current Premises in a "broom-clean" condition and otherwise in its current "AS-IS" condition, within thirty (30) days after the Relocation Date; …. If Tenant fails to so vacate the Current Premises, then (i) Tenant shall be a holdover tenant with respect thereto pursuant to Section 27 of the Lease (and shall pay to Landlord the holdover Rent with respect to the Current Premises as set forth in such Section 27) and (ii) Tenant shall pay to Landlord Rent with respect to the Relocation Premises in accordance with this Amendment.

(A1556 § 3(b)).  Because RGN never performed its tenant build-out in the new space, the Relocation Date had not occurred prior to RGN's breach, and there could be no holdover tenancy subject to Section 27 of the Lease.

## C.  The Bankruptcy Court Did Not Err in its Allowance of Damages

Each party contends that the Bankruptcy Court erred in its calculation of damages for the breach of the Lease.  Debtors' main argument is that the Bankruptcy Court erred in awarding TIAA damages incurred in reliance on the Ninth Amendment, rather than limiting TIAA's recovery to holdover rent under Section 27 of the Lease.[7]  (Civ. No. 21-1430-RGA, D.I. 24 at 26-29).  I agree with the Bankruptcy Court that RGN was not merely a holdover tenant, and that H-Work is liable under the Ninth Amendment. Having so concluded, the Bankruptcy Court broke down TIAA's $5.77 million claim into four separate categories of asserted damages: (1) unpaid rent in the amount of $19,720.44; (2) brokerage commissions in the amount of $2,006,910.17; (3) tenant relocation expenses in the amount of $1,688,009.79; and (4) lobby renovation expenses in the amount of $2,056,169.57. *In re RGN-Group Holdings*, 2021 WL 4203336 at *7.

### 1.  Unpaid Rent

---

[7] Debtors stressed this contention at oral argument.  Debtors argued that the Bankruptcy Court found a breach of the Eighth Amendment but awarded damages as if the Ninth Amendment had been breached.  The Bankruptcy Court found a breach of the Ninth Amendment, finding that amendment to be effective upon signing on December 19, 2019. *In re RGN-Group Holdings*, 2021 WL 4203336 at *6.

With respect to TIAA's claim for unpaid rent, the Bankruptcy Court held that the record supported allowance of unpaid rent, after deduction for application of the security deposit, in the amount of $19,720.44. The allowance of this portion of TIAA's claim is not challenged.

## 2.    Brokerage Commissions

With respect to TIAA's claim for RGN's brokerage commissions, the Bankruptcy Court held that while it was undisputed that TIAA paid brokerage commissions to its own broker and to RGN's broker in connection with negotiation and completion of the Ninth Amendment, it was established at trial that "TIAA paid one of the brokers' invoices in full, even though the engagement letter with [the broker] clearly provides that it was entitled to half of its fee when the Ninth Amendment was executed, and the balance only after RGN[] occupied the new space." *Id.* at *7. The latter condition never occurred, so the Bankruptcy Court disallowed that portion of TIAA's claim for damages. *Id.*

The Ninth Amendment obligates TIAA to pay commissions to both RGN's broker (CBRE) and TIAA's broker (CW). Specifically, Section 16(c) of the Ninth Amendment reads in full: "Any brokerage commissions payable to Brokers are payable by Landlord pursuant to the terms of separate agreements between Landlord and Brokers." (*See* A1568 at § 16(c)). The relevant agreement here is the Master Exclusive Leasing Brokerage Agreement dated November 1, 2010 (TA1135-TA1169) ("Brokerage Agreement"), which provides:

(vi)    Lease commissions are due and payable as follows:

(a)    New Leases: Fifty percent (50%) upon lease execution and fifty percent (50%) upon occupancy or lease commencement, whichever occurs earlier.

(b)    Renewals: Fifty percent (50%) upon lease execution and fifty percent (50%) upon commencement of the renewal term.

(TA1167, Schedule H, General Terms, § (vi)). In its cross-appeal, TIAA argues that the Bankruptcy Court erred in reaching its legal conclusion that the second half of the CW

19

commission was not due until RGN occupied the Relocation Premises and that the Bankruptcy Court improperly disallowed $334,485.03 of TIAA's claim for brokerage commissions. (*See* Civ. No. 21-1476, D.I. 17 at 16-20). According to TIAA, the Bankruptcy Court misinterpreted the amounts payable to CW under the Brokerage Agreement in relation to the execution of the Ninth Amendment to the Lease in two ways: (1) the Bankruptcy Court incorrectly construed the Ninth Amendment to the Lease as a "new lease" under the Brokerage Agreement, and (2) even if the Ninth Amendment were treated as a "new lease," the full CW commission still became due upon its execution. (Civ. No. 21-1476-RGA, D.I. 17 at 16-20).

It does appear that the Bankruptcy Court construed the Ninth Amendment as a new lease, as opposed to a renewal. In its Opinion, the Bankruptcy Court stated that CW "was entitled to half of its fee when the Ninth Amendment was executed, and the balance only after RGN[] occupied the new space." *In re RGN-Group Holdings*, 2021 WL 4203336 at *7. This language is only applicable to new leases, not renewals. (*See* TA1167 § (vi)(a)).

TIAA argues that the Ninth Amendment was not a new lease, but rather, a renewal of the Lease term, and therefore TIAA was obligated to CW commissions under section (vi)(b). (TA1167, Schedule H, General Terms, § (vi)(b)). TIAA further argues that because RGN continued to occupy the Premises, the renewal term commenced immediately upon the signing of the Ninth Amendment. And because the lease execution and the commencement of the renewal term were simultaneous, TIAA argues, it properly paid CW 100% of the brokerage commission, and its claim should have been allowed in full. Conversely, Debtors argue that, to the extent the Court considers the Ninth Amendment to be a lease renewal, the "renewal term" would not have commenced until the Relocation Date, and thus the second half of CW commission did not become payable under the Brokerage Agreement.

I agree with TIAA that the Ninth Amendment is a lease renewal; it further extends the term of the amended Lease.  (TA1192, ¶ 2 ("The Lease Term is extended to expire on the last day of the one hundred and fifty-sixth (156th) full calendar month following the Relocation Date … "). Thus, TIAA was obligated to CW commissions under section (vi)(b).  (TA1167, Schedule H, General Terms, § (vi)(b)).  But I agree with Debtors that the "renewal term" under the Ninth Amendment would have commenced on the Relocation Date.  While I reject Debtors' argument that the Ninth Amendment was never effective, and I affirm that the Ninth Amendment was an enforceable, binding agreement on both sides from its execution, the plain language of the Ninth Amendment concerns the Relocation Premises—and the "renewal term," as it concerned the Relocation Premises, would not "commence" until the Relocation Date.  (TA1192, ¶ 2).  As the Relocation Date never occurred, CW was not entitled to the second half of the commission. Although the Bankruptcy Court applied the "new lease" criteria of section (vi)(a) Brokerage Agreement—as opposed to the "renewal" criteria of section (vi)(b)—in determining the timing of the brokerage commission obligations, the Bankruptcy Court still reached the correct result. Disallowance of TIAA's claim for the second half of CW's brokerage commission in the amount of $334,485.03 may be affirmed because this issue was raised in the Bankruptcy Court, and affirmance is warranted on any basis that finds support in the record.  *In re LMI Legacy Holdings, Inc.* 625 B.R. 268, 289-90 (D. Del. 2020) (citing *Geness v. Cox*, 902 F.3d 344, 356 (3d Cir. 2018)).

### 3.    Tenant Relocation Expenses

The Ninth Amendment contemplated that RGN would move into space that was currently being occupied by other tenants of TIAA.  TIAA's claim asserted out-of-pocket tenant relocation expenses in the amount of $1,688,009.79, and TIAA presented evidence at trial that it moved two tenants to different space, and that a third tenant chose not to move within Lincoln Centre and

21

terminated its lease.  The Debtors argued to the Bankruptcy Court that TIAA should not recover

the $1,541,044.25 in relocation expenses incurred in relocating one of those tenants—Entos—

because TIAA had contractually obligated itself to move Entos prior to executing the Ninth

Amendment with RGN.  Under Texas law, Debtors argued, "The ultimate goal in measuring

damages for a breach-of-contract claim is to provide just compensation for any loss or damage

actually sustained as a result of the breach." *Sharifi v. Steen Auto., LLC*, 370 S.W.3d 126, 148

(Tex. App.—Dallas 2012, no pet.).  If TIAA was already committed to move Entos, Debtors

argued, then such damages were not incurred as a result of the breach of the Ninth Amendment but

on account of a separate contractual obligation with Entos.  The Bankruptcy Court rejected this

argument and allowed the full amount of the tenant relocation expenses including those

attributable to relocating Entos.  *In re RGN-Group Holdings*, 2021 WL 4203336 at *7-8 (footnotes

omitted).

Debtors argue that the Bankruptcy Court erred in awarding that portion of the tenant

relocation expenses attributable to moving Entos.  According to Debtors, the causation element of

TIAA's claim is absent because (1) TIAA voluntarily assumed the Entos relocation obligation

three days before undertaking the obligations in the Ninth Amendment and (2) TIAA alone made

the decision to terminate the Lease before the Ninth Amendment went into effect.  (*See* Civ. No.

21-1430-RGA, D.I. 24 at 29-32; D.I. 32 at 13-14).  TIAA counters that substantial evidence

supports the Bankruptcy Court's findings, which are not clearly erroneous, and that the Debtors'

causation argument lacks merit.  (*Id.,* D.I. 29 at 35-39).

> a.   **The Decision Is Based on Well-Supported Factual Findings that Are Not Clearly Erroneous**

The Bankruptcy Court found as a matter of fact "that the Entos relocation was a critical

element to delivering the space covered by the Ninth Amendment." *In re RGN-Group Holdings*,

22

2021 WL 4203336 at *7. Relying on the testimony of both TIAA's witness, Mr. Barker, and Debtors' witness Mr. Osburn, the Bankruptcy Court observed that "[b]oth sides understood that the Ninth Amendment required TIAA to enter into arrangements with multiple other parties to make the space available, and those arrangements had to be staged around execution of the Ninth Amendment." *Id.* It further found that the record "supports TIAA's assertion that the Entos relocation agreement was signed in furtherance of the commitments TIAA was making to RGN[] under the Ninth Amendment." *Id.*

A finding of fact is clearly erroneous only when it is "completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data." *VICI Racing, LLC v. T-Mobile USA, Inc.*, 763 F.3d 273, 283 (3d Cir. 2014) (quotations omitted). To the extent a lower court's conclusions rest on credibility determinations, the appellate court's "review is particularly deferential." *Id.* (quoting *Travelers Cas. & Sur. Co. v. Ins. Co. of N. Am.*, 609 F.3d 143, 156–57 (3d Cir. 2010)). "The Bankruptcy Court is best positioned to assess the facts, particularly those related to credibility and purpose." *In re Myers*, 491 F.3d 120, 126 (3d Cir. 2007). I review the record to determine whether the Bankruptcy Court's findings were clearly erroneous, *i.e.*, whether I am "left with a definite and firm conviction that a mistake has been committed." *VICI Racing*, 763 F.3d at 298 (quoting *Speyer, Inc. v. Humble Oil and Refining Co.*, 403 F.2d 766, 770 (3d Cir. 1968)).

Substantial evidence supports the Bankruptcy Court's findings with respect to the relocation of Entos. TIAA could not deliver the Relocation Premises without moving Entos (and two other tenants) out of their pre-existing leased space. (8/12/21 Tr. at A0760:6-15). Entos had no desire to move out of its pre-existing space. (A0793:20-A0794:5). TIAA had no financial incentive to move a happy tenant and incur over $100 per square foot in tenant improvements for a lease with five years remaining on its term but for the obligation to deliver the Relocation

23

Premises. (*Id.* at A0794:6-18). Because TIAA would be required to deliver the Relocation Premises, TIAA convinced Entos to move, and took the financial hit to build out the replacement leased space comparably to that which Entos—a design firm—was leaving behind.

I further agree that the fact that TIAA executed the agreement with Entos three days before the Ninth Amendment is of no moment. The Bankruptcy Court found that this timing was merely incidental to the larger commercial arrangement. (*See* 8/12/21 Tr. at A0793:20-A0794:5). "The fact that the relocation agreement with Entos was signed shortly before the Ninth Amendment is simply an unremarkable feature of a complicated commercial arrangement that TIAA and RGN[] fully understood would require the involvement or cooperation of multiple third parties." *In re RGN-Group Holdings*, 2021 WL 4203336 at *8. This finding is supported by the record. (*See* TA054-TA065 (emails between RGN's representative and TIAA's broker regarding Entos relocation as early as February 2020); *id.* at TA077-TA080). I find no basis to disturb the Bankruptcy Court's decision.

### b.    Debtors' Causation Arguments Lack Merit

Debtors argue that the causation element of TIAA's claim is absent because TIAA voluntarily assumed the Entos relocation obligation three days before undertaking the obligations in the Ninth Amendment. This argument was rejected by the Bankruptcy Court based on the well supported factual findings discussed *supra.* Debtors further argue that causation is lacking because TIAA alone made the decision to terminate the Lease before the Ninth Amendment went into effect. This argument also fails. The costs to relocate Entos are recoverable under Section 25(d) of the Lease. TIAA had a contractual right to recover those costs in the event of a termination for default. (A1418 § 25(d)). As such, these costs are not an improper benefit from premature termination. Moreover, out-of-pocket costs incurred in reliance on a promise to perform a contract are a recognized form of damages. *See AKIB Constr. Inc. v. Shipwash*, 582

24

S.W.3d 791, 808 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (noting one "measure of damages for breach of contract is the reliance measure, which seeks to put the injured party in as good an economic position as it would have occupied had the contract not been made"). It is no answer for Debtors to argue that RGN was willing and able to perform. RGN breached, and TIAA had a legal right to termination.

In sum, I find no error in the Bankruptcy Court's allowance of the tenant relocation expenses.

### 4.    Lobby Renovation Expenses

TIAA's claim sought allowance of its expenses incurred on account of renovations to the lobby of One Lincoln Center in the amount of $2,056,169.57. TIAA asserted that the renovations, which included moving restroom facilities from one side of the building to the other, were done in connection with the Ninth Amendment and for the benefit of RGN. Debtors argued that the lobby renovations were undertaken by TIAA as part of its overall renovation project, separate from any obligations or commitments embodied in the Ninth Amendment.

The sole provision of the Ninth Amendment that TIAA relies upon to support its claim to recover the lobby renovation costs is undetailed and somewhat vague. Schedule Two of the Ninth Amendment's Work Letter states, "Landlord will update the 5400 Building lobby with new Class A finishes to be completed by the Relocation Date." (*See* TA1218, at Ex. B, Sched. 2). No other provision in the Ninth Amendment, or elsewhere, provides any further guidance or details concerning TIAA's build-out obligations.

The Bankruptcy Court held that the Debtors submitted ample evidence at trial to demonstrate that the lobby was renovated not as part of the Ninth Amendment but rather in connection with TIAA's plan for the comprehensive updating of the entirety of Lincoln Centre. *In re RGN-Group Holdings*, 2021 WL 4203336 at *8. "TIAA completed the work and enjoys the

benefits of improved lobby facilities in its building." *Id.* Accordingly, the Bankruptcy Court denied that portion of TIAA's claim for damages covering costs it incurred in renovating the lobby. *Id.*

In its cross-appeal, TIAA argues that the Bankruptcy Court erred as a matter of law in denying TIAA's claim for its lobby renovation expenses. (*See* Civ. No. 21-1476, D.I. 17 at 20-25). TIAA argues that the unambiguous terms of the Ninth Amendment provided that TIAA "will update the 5400 Building lobby with new Class A finishes," and that TIAA would not have incurred the lobby renovation costs but for the requirement in the Ninth Amendment. (Civ. No. 21-1476-RGA, D.I. 23 at 16-17). Debtors argue that the Bankruptcy Court did not clearly err by failing to adopt TIAA's argument that, if not for the Ninth Amendment, TIAA would have left this building in an outdated 1980's condition while the other, attached portions of the Lincoln Centre complex were all updated with modern Class A finishes. Although TIAA claims it would not have renovated this building had RGN not entered into the Ninth Amendment, Debtors argue that TIAA's witnesses provided testimony supporting the Bankruptcy Court's finding that TIAA completed the lobby and restroom renovations as part of its plan for the comprehensive updating of the entirety of Lincoln Centre —not pursuant to any purported obligation articulated by the Ninth Amendment.

I agree that the record supports the finding that TIAA completed the lobby and restroom renovations as part of its comprehensive plan for updating all of Lincoln Centre. Both sides presented testimony that TIAA is in the midst of a comprehensive $43 million renovation and updating of the entirety of Lincoln Centre, which includes three office towers, a hotel, retail space and parking, and that the renovation "is intended to refresh commercial space originally built in 1981 and to ensure that it remains a Class A property." (*See* 8/12/21 Tr. at TA0595:15-TA0596:7 (testifying that TIAA commenced its Master Plan to update and modernize the common areas

26

(including the lobbies, conference rooms, and food and coffee shops) of Buildings Two and Three once Atmos Energy signed its lease in those buildings); *id.* at TIAA0594:19-TIAA0595:8 (testifying that Buildings One, Two, and Three (and the hotel) are connected by adjoining hallway); *id.* at TIAA0597:23-TIAA0598:4, TIAA0655:9-18 (testifying that, consistent with TIAA's long-term view, the renovations done to One Lincoln Centre are aesthetically consistent with the renovations that were being done in the other two buildings). The record further supports the Bankruptcy Court's finding that the lobby renovation was completed exclusively by TIAA in a manner to ensure that the lobby was consistent with and matched the scheme of the overall renovation of Lincoln Centre. (*See* TIAA0652:17-23 (testifying that the $2.1 million TIAA spent to update the lobby in One Lincoln Centre was part of the "master plan" for comprehensive renovation). Moreover, as the Bankruptcy Court observed, the record is devoid of any evidence that RGN would participate in any respect in the design or renovation of the lobby. (*See* 8/12/21 Tr. at TIAA0599:14-19) (TIAA did not give RGN any right to design the lobby or approve (or veto) any renovation); *id.* at TIAA0656:5-10 (no part of the master plan or any renovations in One Lincoln Centre were implemented solely for RGN's benefit).

The Bankruptcy Court's determination is based on well-supported findings of fact, and TIAA has failed to carry its burden of demonstrating any its findings are clearly erroneous.

### 5.    Restroom Relocation Expenses

TIAA argues, if it is not entitled to its lobby renovation costs, the Bankruptcy Court should have allowed that portion of TIAA's claim for damages covering the lobby's restroom relocation. (*See* Civ. No. 21-1476, D.I. 17 at 26-27; D.I. 23 at 20-21).

The record supports the Bankruptcy Court's denial of the lobby renovations as a whole. The evidence clearly demonstrates TIAA updated its restrooms for the same reason it updated the lobby—the restrooms were dated and needed to be modernized to match the updated aesthetic

27

design of the lobby and other common areas renovated under TIAA's overall plan. (*See* 8/12/21 Tr. at TIAA0519:17-19 (Mr. Barker testifying that TIAA "modernize[d] the common areas of the lobbies and restrooms to bring [them] up to more of the elevated standards . . .")). Mr. Barker testified that TIAA modernized the restrooms both aesthetically and functionally, which included the installation of new, touchless faucets and other amenities that an updated high-rise building would require. (*Id.* at TIAA0552:22-TA0553:2; *see also* TIAA0656:5-10 (no renovations in One Lincoln Centre were implemented solely for RGN's benefit)). The record supports a finding that that TIAA's purported damages are not the result of a mere relocation of the restrooms, but rather, as part of TIAA's overall plan to update and modernize the lobby, and as such, that disallowance of the restroom relocation expenses was appropriate.

## V.   CONCLUSION

I find no error in the Bankruptcy Court's determinations that H-Work remained in contractual privity and that the Lease was breached. I further find no error in the Bankruptcy Court's determination that TIAA's claim should be allowed in the reduced amount of $3,380,155.37. I will therefore affirm the Order.

A separate order will be entered.